# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| GRETCHEN LEWIS and RANDY LEWIS, | ) ) ) |
| Plaintiffs, | ) ) ) Docket No. 2:22-cv-00054-NT |
| v. | ) ) |
| SPURWINK SERVICES, INC., | ) ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Before me is the Defendant's Motion to Dismiss the Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. ("**Def.'s Mot.**") (ECF No. 5). For the reasons stated below, the motion to dismiss is **DENIED**.

## BACKGROUND[1]

Plaintiffs Gretchen and Randy Lewis are the parents and legal guardians of Sean Lewis. Compl. ¶¶ 1–2 (ECF No. 1). Sean is an adult who is non-verbal and significantly developmentally disabled. Compl. ¶ 2. Sean has been diagnosed with multiple physical and cognitive disabilities, including autosomal deletion syndrome, seizure disorder, and autism. Compl. ¶ 2.

Defendant Spurwink Services, Inc. ("**Spurwink**") is a nonprofit corporation that provides, among other things, residential services for adults with intellectual

---

[1] The facts below are drawn from the allegations in the Complaint, which I take as true for the purposes of deciding a motion to dismiss. *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

disabilities in Maine. Compl. ¶¶ 3, 6. Sean lived in a Spurwink residential program in Portland with two other residents with disabilities from 2012 until June of 2017.[2] Compl. ¶ 9. Spurwink provided three staff members to care for the three residents, including Sean, at all times, including overnight. Compl. ¶ 11. Spurwink received compensation from the Maine Department of Health and Human Services ("**DHHS**") and/or other state or federal governmental agencies to provide services for Sean. Compl. ¶ 10. The Plaintiffs entrusted Spurwink with the care and supervision of their son, who lacked the ability to care for himself, and while under Spurwink's care, Sean was subject to Spurwink's supervision, authority, and control. Compl. ¶ 12. All of Spurwink's professional staff members charged with "responsibility for the care or custody of an incapacitated or dependent adult"—like Sean Lewis—are mandated reporters under Maine law. Compl. ¶ 8 (quoting 22 M.R.S. § 3477).

Around June 6, 2016, Gretchen Lewis discovered that Sean had suffered a broken toe, but, because Sean is non-verbal and has very limited cognitive skills, he could not explain what happened to him. Compl. ¶ 13. She asked Spurwink staff what had happened, but they claimed they did not know what had caused Sean's broken toe. Compl. ¶ 14. About two weeks later, the executive director from Sean's therapeutic horse-riding program contacted Gretchen to inform her that she had discovered very unusual bruising on Sean's body, and, as a mandated DHHS reporter, she had reported the bruising to the Adult Protective Services division at DHHS.

---

[2]     Sean was first admitted into a different Portland-based Spurwink residential program in 2011 when he was fourteen years old, but was then transferred in 2012. Compl. ¶ 9 (ECF No. 1).

2

Compl. ¶¶ 7, 15. Four days later, Spurwink staff contacted Gretchen to report that they discovered Sean had serious bruises on his forearm; the staff claimed they did not know the causes of the bruising. Compl. ¶ 16. The nurse working for Sean's primary care provider reported the injuries to DHHS Adult Protective Services four days later on June 24, 2016. Compl. ¶ 17. On or about June 27, 2016, Gretchen visited Sean at Spurwink and discovered very serious bruising under Sean's right eye and several other bruises all over his body. Compl. ¶ 18. Sean was taken to an emergency clinic later that day, where the doctor diagnosed him with multiple contusions. Compl. ¶ 19. Spurwink staff again claimed that they did not know the causes of the bruising. Compl. ¶ 18.

On July 1, 2016, Spurwink staff called Gretchen and told her that Sean had fallen and hit his head, and that he was bleeding from the ear and forehead as a result of serious lacerations. Compl. ¶ 20. Spurwink staff took Sean to the emergency room where doctors sedated Sean and stitched his ear. Compl. ¶ 21. On or about July 23, 2016, Spurwink staff called Gretchen to inform her that they discovered serious bruising under both of Sean's eyes; they claimed they did not know the causes of the bruising. Compl. ¶ 22.

On or about August 20, 2016, Spurwink staff called Gretchen to inform her that they had discovered serious bruising all over Sean's stomach and torso. Compl. ¶ 23. Staff transported Sean to the emergency room, where Gretchen and Randy Lewis met them. Compl. ¶ 23. Staff claimed they did not know the causes of the bruising. Compl. ¶ 23.

On August 23, 2016—more than ten weeks after Spurwink learned of the first of many reports of unexplained, serious, on-site physical injuries to Sean—Sean was examined by a nurse practitioner at Spurwink's Child Abuse Program.[3] Compl. ¶ 24. The nurse practitioner interviewed Spurwink staff and Sean's parents, consulted with the Program's medical director, and reviewed photos, medical records, and incident reports. Compl. ¶ 24. The Spurwink Child Abuse Program produced a nine-page report on August 30, 2016, which included the following assessment:

> While it remains possible, although less likely, that a medical condition may be the cause of unexplained bruising, one must continue to be very suspicious that he is being physically abused . . . A thorough investigation is recommended . . . Given the severity of the unexplained injury, there are concerns that this adolescent is at risk for future, more serious, perhaps even life threatening injury without appropriate safety planning and investigation.

Compl. ¶ 25.

The report also recommended a second opinion by an unaffiliated specialist, so a pediatrician specializing in childhood abuse and trauma at Children's Hospital at Dartmouth in New Hampshire reviewed Sean's file and the Spurwink Child Abuse Program materials. Compl. ¶¶ 25–26. Among other findings, this pediatrician concluded that it was very likely that Sean was physically abused and that there was a very serious risk of future life-threatening injuries. Compl. ¶ 26. On December 6, 2016, DHHS issued a report concluding that, although DHHS "suspected abuse," it could not substantiate the reports of abuse and neglect "because the child abuse

---

[3] It is not clear from the Complaint why Sean's case was handled by Spurwink's Child Abuse Program. According to paragraph 9 of the Complaint, Sean was fourteen years old in 2011; the events alleged in the Complaint began in the summer of 2016, five years later, at which time Sean presumably would have been considered an adult.

specialists could not 100% conclude that the bruising was a result of the abuse." Compl. ¶ 27.

On or about April 16, 2017, Spurwink staff transported Sean to his parents' home in Augusta. Compl. ¶¶ 1, 28. Gretchen discovered serious bruising on Sean's arm and called Spurwink staff, but they again claimed not to know the causes of the bruising. Compl. ¶ 28. Gretchen brought Sean to Maine General Hospital in Augusta, where X-rays confirmed that he had a fractured arm. Compl. ¶ 29. He underwent emergency surgery, and a plate and screws were needed to hold the bones together. Compl. ¶ 29.

Spurwink employees and agents did not report any of Sean's injuries to DHHS at any time while he was in Spurwink's care. Compl. ¶ 32. In June of 2017, Sean's parents moved Sean from Spurwink to an assisted living facility in Belfast. Compl. ¶ 30. Since then, there have been no similar incidents of inexplicable physical injury to Sean. Compl. ¶ 31.

On February 24, 2022, Plaintiffs Gretchen and Randy Lewis filed their three-count Complaint against Spurwink. Compl. In the one federal claim, Count III, the Plaintiffs assert disability discrimination in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("**§ 504**"). Compl. ¶¶ 48–53. They allege that Spurwink, a recipient of federal funding, violated § 504's antidiscrimination provisions when it:

> denied Sean the opportunity to participate in or benefit from services free from abuse, neglect, injury, harm, or discrimination; failed to provide Sean with the opportunity to participate in or benefit from services equal to those afforded others; failed to provide Sean with aid,

5

> benefits, or services equal to and/or as effective as those afforded others; aided or perpetuated discriminatory acts committed by Spurwink employees and agents; and otherwise limited Sean's enjoyment of rights, privileges, advantages, or opportunities to be free from discrimination, abuse, neglect, or injury.

Compl. ¶¶ 50, 52.

The Plaintiffs also bring two state law claims against Spurwink. In Count I, asserting negligence, they allege that Spurwink breached the duty of care owed to Sean by failing to provide him with a reasonably safe residence or professional care and failing to protect him from abuse, neglect, and harm (among other things). Compl. ¶¶ 33–38. Count II asserts a claim of negligent supervision, alleging that Spurwink owed Sean a duty of care to supervise and control the acts and omissions of its employees and agents and to prevent them from intentionally or negligently harming Sean, and that Spurwink breached that duty. Compl. ¶¶ 39–47.

Spurwink now moves to dismiss Count III of the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Plaintiffs' disability discrimination count fails to state a claim upon which relief can be granted because the Complaint alleges more than one cause of Sean's alleged injuries. Def.'s Mot. 5–7. Spurwink then requests that I decline to exercise supplemental jurisdiction over the Plaintiffs' remaining state tort claims. Def.'s Mot. 7–9.

## LEGAL STANDARD

Generally, to survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

6

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 205 (1st Cir. 2020). Under this "make-or-break standard," *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.* (quoting *Iqbal*, 556 U.S. at 663). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

**I.    Count III – Disability Discrimination under § 504**

Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of . . . his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Thus, to allege a claim under § 504, a plaintiff "must show (1) that she is disabled; (2) that she sought services from a federally funded entity; (3) that she was 'otherwise qualified' to receive those services;  and (4) that she was denied those services 'solely by reason of her . . . disability.' " *Lesley v. Hee Man Chie, M.D.*, 250 F.3d 47, 53 (1st Cir. 2001) (quoting 29 U.S.C. § 794(a)).

To meet the "solely by reason of his disability" element, an individual with a disability must show that "(1) there is a causal connection between his disability and

7

the discriminatory action; and (2) his disability was the only cause of the discriminatory action." *McCann ex rel. J.M. v. York Sch. Dep't*, 365 F. Supp. 3d 132, 145 (D. Me. 2019) (internal quotation marks omitted) (quoting *Shaikh v. Tex. A & M Univ. Coll. of Med.*, 739 F. App'x 215, 222 (5th Cir. 2018)).[4] "The causal connection between the individual's disability and the discriminatory action 'need not be direct' in order to satisfy the 'sole reason' requirement: it is sufficient that the disability caused the individual to do or not do something, which, in turn, caused the discriminatory action." *Shaikh*, 739 F. App'x at 222 (quoting *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994)).

### A. The Plaintiffs' § 504 Allegations

The Complaint alleges—and Spurwink does not dispute—that Sean has a disability and that Spurwink, where Sean obtained services that he qualified for because of this disability, receives federal funding. Compl. ¶¶ 2, 9–10, 50–51; *see* Def.'s Mot. 6. But Spurwink argues that the Complaint does not plausibly allege the fourth element, that Sean was denied the benefits of any Spurwink program "solely by reason of his disability." Def.'s Mot. 6 (quoting *McCann*, 365 F. Supp. 3d at 145). According to Spurwink, the Complaint fails to demonstrate (a) a causal connection

---

[4] Exactly how to apply § 504's "sole causation test" remains "an open question" in the First Circuit—that is, whether "disability discrimination need only be *a* reason, as opposed to the *sole* reason." *Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995) (emphasis added). Other courts have noted, however, that the "'solely by reason of' inquiry is designed to weed out § 504 claims where an employer can point to conduct or circumstances that are causally unrelated to the plaintiff's handicap." *Teahan v. Metro-N. Commuter R.R. Co.,* 951 F.2d 511, 516 (2d Cir. 1991) (collecting cases involving other, non-disability-related, reasons such as employer's budget constraints and restructuring, plaintiff's abusive behavior, and other job candidate having greater work experience and better prior work record than plaintiff); *see Jenkins v. Bos. Hous. Ct.*, 350 F. Supp. 3d 1, 6 (2018) ("Because [plaintiff] has alleged various grounds for his termination, not only disability, the Rehabilitation Act claim must fail.").

between Sean's disability and the alleged discriminatory action or (b) that his disability was the only cause of the discriminatory action given that the Complaint alleges facts showing that his unexplained injuries were "also possibly caused by abuse or neglect or a medical condition." Def.'s Mot. 6–7.

At this early stage, however, the Plaintiffs need not "demonstrate" anything; they must plausibly allege. Read generously, the Complaint sketches out several discriminatory actions that were allegedly taken by Spurwink because of Sean's disability. To start, the Complaint alleges that, "through the acts and omissions of its employees and agents," Spurwink deprived Sean of its "services free from abuse, neglect, injury, harm, or discrimination." Compl. ¶ 52. Taken with the other factual allegations, the Plaintiffs seem to be alleging that Spurwink may be vicariously liable for the actions of its agents. Although this theory was not briefed by the parties, it is a plausible avenue of recovery for the Plaintiffs. Other courts in the First Circuit have held that an employer may be held vicariously liable for an employee's violation of § 504 of the Rehabilitation Act and the Americans with Disabilities Act ("**ADA**"). *See Fortin ex rel. TF v. Hollis Sch. Dist.*, No. 15-CV-179-JL, 2017 WL 4157065, at *5–6 (D.N.H. Sept. 18, 2017) (citing cases).[5] Here, although the exact causes of Sean's

---

[5] In *Fortin ex rel. TF v. Hollis School District*, No. 15-CV-179-JL, 2017 WL 4157065 (D.N.H. Sept. 18, 2017), the court denied the employer school district's motion for summary judgment on the issue of vicarious liability. The plaintiffs had brought claims under the Rehabilitation Act and the Americans with Disabilities Act ("**ADA**") for the discriminatory acts of a paraprofessional assigned as one-on-one support for a student with autism and speech disorders. *Id.* at *1–2. The paraprofessional was alleged to have physically abused the student. *Id.* In rejecting the school district's argument against vicarious liability, the court noted that other federal courts have recently concluded that an employer may be held vicariously liable in such cases if the plaintiff demonstrates "that the perpetrator of the alleged abuse . . . was deliberately indifferent to her rights." *Id.* at *5 (quoting *K.T. v. Pittsburg Unified Sch. Dist.*, 219 F. Supp. 3d 970, 981 (N.D. Cal. 2016); *see also Reed v. State of Ill.*,

9

injuries are not known, one inference readily apparent in the Complaint is that one of his Spurwink employee caretakers was physically abusing him, because when he left Spurwink, the inexplicable injuries stopped.[6] The Complaint thus sets forth sufficient facts to allow the Plaintiffs' claim based on Spurwink's vicarious liability to proceed.

In addition, the Complaint alleges that Spurwink discriminated against Sean by failing to provide him "with the opportunity to participate in or benefit from services equal to those afforded others" and "with aid, benefits, or services equal to and/or as effective as those afforded others." Compl. ¶ 52. I take this as alleging that Sean was being discriminated against because of his disability. The Complaint alleges at least eight instances of Sean suffering unexplained injuries while under the care and supervision of Spurwink staff, including repeated serious bruising and broken bones on two separate occasions. Other than one reported fall in July that resulted in Sean needing stitches on his head, Spurwink staff claimed that they did not know what was causing any of Sean's recurring injuries over the course of ten months. The Complaint further alleges that Spurwink staff failed to report the

---

No. 12-CV-7274, 2016 WL 2622312, at *3 (N.D. Ill. May 9, 2016) ("[O]ther courts have found *respondeat superior* liability to apply to lawsuits under Title II of the ADA or section 504 of the Rehabilitation Act.").

[6]   Contrary to the Defendant's contention, the Plaintiffs' inability to pinpoint the exact cause of Sean's bruising does not doom Count III. In pleading their § 504 claim, the Plaintiffs do not provide any non-disability-related reason that might undercut the allegation that Sean was discriminated against because of his disability—Sean's disability is the only reason alleged in the Complaint. *Cf. Forestier Fradera v. Mun. of Mayagüez*, 440 F.3d 17, 23 (1st Cir. 2006) (holding in ADA case that there was no reasonable basis for inferring that the defendants' delay in installing an elevator was because of the plaintiff's disability where the plaintiff himself attributed the elevator delay "*solely* to political discrimination on account of his membership in the minority party").

10

injuries to DHHS as mandated by law. Because of his disabilities, Sean is non-verbal with very limited cognitive skills so he could never tell anyone the cause of his serious injuries. This line of allegations supports another plausible inference, which factual development could bear out, that it was because of Sean's disability—specifically, the fact he is non-verbal—that the injuries continued as they did.

The conclusion that the Plaintiffs have pled enough to survive a motion to dismiss follows from a recent § 504 case in this Court, *McCann ex rel. J.M. v. York School Department*, 365 F. Supp. 3d 132 (D. Me. 2019), which both parties relied on in their briefs. In that case, the parent plaintiffs alleged that the defendant school knew that their son's disability manifested in fear and anxiety, and that the son had reported to school officials that he was being bullied and another student had threatened to have him beat up. *Id.* at 138, 145. After the son was assaulted during school hours, the parents sued the school. *Id.* at 138. In denying the school's motion to dismiss the § 504 claim, Judge Levy held that the complaint plausibly alleged that the school's "failure to fully investigate and address" the son's bullying reports "was because of J.M.'s disability" where it was plausible that the school "discounted the seriousness" of the reports because the school saw them as "manifestations" of the son's disability.[7] *Id.* at 145. The Court noted that " '[t]he possibility of additional, or alternative, reasons . . . does not detract from the plausibility of the allegation' that

---

[7] The manifestation of a disability suffices to meet the "solely by reason of disability" requirement under § 504, as the Second Circuit explained with the following hypothetical: "An employee has one leg shorter than the other, causing him to limp, which we assume is a 'handicap' under § 504. The limp causes the worker to make a loud 'thump' when he takes a step. He is fired, his employer says, because of the thumping." *Teahan v. Metro-North Commuter R.R. Co.,* 951 F.2d at 516. In that case, even if the employer's action was because of the thump, the thump is a "symptomatic manifestation of the handicap [the limp]." *Id.* at 517.

11

J.M.'s disability was the 'sole reason' for the School Department's response (or lack thereof)." *Id.* (quoting *Shaikh*, 739 Fed. App'x at 223). "Therefore, the fact that J.M.'s physical injuries were caused by another student does not mean that the alleged discrimination did not occur 'solely by reason of his disability.' " *Id.* at 146.

As was the case in *McCann*, here the Plaintiffs have plausibly alleged that Spurwink discriminated against Sean because of Sean's disability by not providing him with services equal to those given others. The allegations and the reasonable inferences I draw from them suggest that Sean's inability to tell others what was happening to him is a manifestation of his disabilities. Whatever the exact cause of Sean's physical injuries, the Plaintiffs plausibly assert a scenario whereby Sean would not have endured repeated injuries under Spurwink's care if he did not have a disability that made him non-verbal. They therefore have adequately pled that the discrimination occurred solely by reason of Sean's disability.

The Plaintiffs also allege that Spurwink violated the Rehabilitation Act by "aid[ing] or perpetuat[ing] discriminatory acts committed by Spurwink employees and agents" and "otherwise limiting Sean's enjoyment of rights, privileges, advantages, or opportunities to be free from discrimination, abuse, neglect, or injury." Compl. ¶ 52. Unlike the vicarious liability allegations, this appears to be an allegation that Spurwink is directly liable for its own actions in permitting the alleged abuse to occur. The Complaint alleges that Spurwink did not investigate until more than ten weeks after the first injury, and that further injuries occurred to Sean at Spurwink even after the investigation raised the red flag that Sean was at risk for future serious

12

injuries. The ready inference is that Spurwink's actions and inactions directly caused the continued harm to Sean where Spurwink failed to timely monitor, investigate, and intervene.

At this stage, the Plaintiffs have sufficiently pled several theories of recovery that could be viable under the Rehabilitation Act.

### B.    Intentional Discrimination under § 504

In addition, the Defendant argues that, because "intentional discrimination" is needed to state a § 504 claim for compensatory damages, the Plaintiffs' claim "is inconsistent with and cannot be pleaded in the alternative to negligence-based claims or causes for a plaintiff's alleged harm." Def.'s Mot. 6. But the Defendant offers no citation for this proposition, which runs counter to the Federal Rules of Civil Procedure, which permit a party to "set out 2 or more statements of a claim . . . alternatively or hypothetically" and "state as many separate claims . . . as [the party] has, regardless of consistency." Fed. R. Civ. P. 8(d)(2)–(3).

The Defendant also argues that the Complaint must allege action taken by Spurwink that was intentionally discriminatory. Def.'s Reply to Pls.' Opp'n 1, 3 (ECF No. 7). Again, the Defendant does not provide a citation. The Plaintiffs suggest that the standard can be met with deliberate indifference and maintain that proof of discriminatory intent comes in later, at trial in order to recover compensatory damages, and is not a prima facie element that must be made out at the pleading stage. *See* Pls.' Opp'n to Mot. to Dismiss 3 (ECF No. 6).

What standard the First Circuit would employ in a § 504 Rehabilitation Act claim is unclear, and the parties have not adequately briefed the issue. Other district

13

courts have recognized that "[t]he First Circuit Court of Appeals has not directly addressed the question of which standard applies to show intentional discrimination" but has "suggested that a plaintiff 'may' need to make 'some showing of deliberate indifference'" to prevail under § 504. *Fortin*, 2017 WL 4157065, at *4 (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 125 (1st Cir. 2003)); *see Doe v. Bradshaw*, 203 F. Supp. 3d 168, 191 (D. Mass. 2016) ("Discrimination claims under the Rehabilitation Act and the ADA require a showing of disability-based animus. The First Circuit has suggested that deliberate indifference is enough to satisfy this requirement of intentional discrimination." (internal citation and quotation marks omitted)). The majority of Courts of Appeals have held that a plaintiff may prove the discriminatory intent needed to prevail on a claim for compensatory damages under the Rehabilitation Act by showing that a defendant was deliberately indifferent to the plaintiff's statutorily protected rights. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) ("The standard for intentional violations is deliberate indifference to the strong likelihood of a violation." (internal quotation marks omitted)); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) ("We now follow in the footsteps of a majority of our sister courts and hold that a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504 of the RA and § 202 of the ADA."); *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) ("*Davis* [*v. Monroe County Board of Education,* 526 U.S. 629, 645–47 (1999)] requires a showing of deliberate indifference on the part of the school in order to impose liability, and has been applied to disability-based peer-on-peer harassment

14

claims brought under the ADA and § 504 by the majority of federal district courts to have addressed the issue."); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) ("The district court decided that deliberate indifference was the appropriate standard for showing intentional discrimination in this type of case. A number of other circuits have so ruled, and we agree."); *Duvall v. Cnty. of Kitsap,* 260 F.3d 1124, 1138 (9th Cir.), *as amended on denial of reh'g en banc* (9th Cir. 2001) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant. . . . We now determine that the deliberate indifference standard applies."); *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228–29 (10th Cir. 2009) ("Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." (internal quotation omitted)); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) ("A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights.").

"[D]eliberate indifference in the context of intentional discrimination comprises two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.' " *Barber*, 562 F.3d at 1229 (quoting *Duvall*, 260 F.3d at 1139). While it is premature to rule on the standard that will be applied going forward given the state of the briefing, it is

15

certainly possible, if not likely, that deliberate indifference will suffice. Drawing all reasonable inferences in the Plaintiffs' favor, the Complaint sufficiently alleges deliberate indifference by Spurwink. Thus, the Complaint states a plausible claim under § 504, and the Defendant's motion to dismiss Count III is denied.

## II.     Counts I and II – State Law Negligence Claims

The Defendant requests that, in the event I dismiss the one federal disability discrimination claim, I decline to exercise supplemental jurisdiction over the Plaintiffs' two state law claims. *See Borrás-Borrero v. Corporación del Fondo del Seguro del Estado*, 958 F.3d 26, 36 (1st Cir. 2020) ("[D]istrict courts may decline to exercise supplemental jurisdiction over pendent state law claims when the anchor federal claims for those state law claims are dismissed."). Because I am denying the Defendant's motion to dismiss the federal § 504 claim, I retain jurisdiction over the state tort claims.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's Motion to Dismiss (ECF No. 5).

SO ORDERED.

/s/ Nancy Torresen  
United States District Judge

Dated this 6th day of December, 2022.