UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GRETCHEN LEWIS and <br> RANDY LEWIS, individually <br> and as Guardians of SEAN LEWIS, <br><br> Plaintiffs, <br><br> v. <br><br> SPURWINK SERVICES, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Docket No. 2:22-cv-00054-NT <br> ) <br> ) <br> ) <br> ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The action before me is a disability discrimination and negligence case. The Plaintiffs are the parents of Sean Lewis, a nonverbal teenager who has multiple physical and cognitive disabilities that required him to be placed in a residential treatment program run by Defendant Spurwink Services, Inc. ("**Spurwink**"). The Plaintiffs claim that Sean was seriously injured while living at a Spurwink facility. They assert a disability discrimination claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("**§ 504**"), as well as state law tort claims for negligence and negligent supervision. Before me is Spurwink's motion for summary judgment (ECF No. 66) on all three claims brought by the Plaintiffs. Because there are genuine issues of material fact that preclude entry of summary judgment, I **DENY** Spurwink's motion.

I. **Disputed Material Facts as to All Claims**

Central among the many[1] disputed facts is what caused Sean's injuries at Spurwink, which included a broken toe, a fractured arm, lacerations, and multiple instances of unexplained bruising. In its motion, Spurwink puts forward a theory that Sean's injuries were caused by self-injurious behavior such as Sean using his own foot, which was in a hard plastic boot to treat the broken toe, to hit his body. Spurwink points to evidence that Sean has engaged in self-injurious behavior in the past, before he was in Spurwink's care, and that he continued to suffer injuries after he left Spurwink's care.

The Plaintiffs, on the other hand, believe that Sean's injuries are the result of abuse, neglect, and/or discrimination because of Sean's disabilities. The Plaintiffs put forward their own evidence to negate Spurwink's self-injurious behavior theory, such as highlighting statements made by Spurwink staff that Sean was not engaging in serious self-injurious behavior during the summer of 2016.[2] To further oppose Spurwink's self-injury theory, the Plaintiffs point to concerns raised by Spurwink's

---

[1] The parties' combined statement of material facts comprises 150 facts and spans over 140 pages. Although there is some agreement as to Spurwink's corporate existence and Sean's condition and medical history, the vast majority of the parties' facts are followed by denials or qualifications, replies to the denials or qualifications, requests to strike, and replies to the requests to strike. Simply put, there is not much that the parties agree upon.

[2] Spurwink staff reported to the child abuse specialist at Spurwink that Sean "does not engage in any significant self injurious behavior" and that, even though he "sometimes bangs his elbows" and "strike[s] the side of his face with his hands," Sean "doesn't seem to do this hard enough to hurt himself." Sarah A. Camire, RN, MS, NP-C Medical Evaluation ("**Spurwink Medical Evaluation**"), PageID #1543 (ECF No. 65-4). One staff member also noted that "if Sean had been hurting himself while alone in the room they would probably hear it." Spurwink Medical Evaluation, PageID #1544.

2

own Director of Nursing of Children's Services and the child abuse specialist at Spurwink who conducted a medical evaluation.

The Director of Nursing wrote in a June 2016 email that she was "VERY concerned about Sean . . . . He looked like he had been punched in the left eye, with bru[i]sing up over his forehead, and small red marks under his left eye, big bruise on left forearm and small thumbprint size bruises over his right chest and back." Dara Oja, NP, BSN email to Spurwink personnel ("**Spurwink Email**"), PageID #2907 (ECF No. 74-13). The Director of Nursing outlined that:

> The biggest worries are obviously
> 1. Is it a medical problem?
> 2. Is there physical abuse?
> 3. If "self inflicted" has there been enough or appropriate supervision of him?

Spurwink Email, PageID #2906. Two months later, she again emailed Spurwink personnel about abdominal bruising observed on Sean over an August weekend, which she found "VERY concerning," and she had "thought this issue had resolved." Spurwink Email, PageID #2933. She wrote that, because Spurwink had not identified any other cause of the bruising, she was "very worried about abuse." Spurwink Email, PageID #2933.

Spurwink's child abuse specialist's assessment, conducted in August 2016, includes the following paragraph:

> While it remains possible, although less likely, that a medical condition may be the cause of this adolescent's unexplained bruising, one must continue to be very suspicious that this adolescent is being physically abused. It is possible that Sean has injured himself in some way, though he has not been described as someone who typically engages in self-injurious behavior and he has reportedly been monitored very closely in the recent weeks to months. A thorough investigation is recommended

3

> at this time given the continued concerns about this adolescent's safety. The abdominal bruising he currently has is quite impressive. The abdomen is an unusual place to see an accidental injury or bruise because of the lack of bony prominences. This adolescent has also previously had a bruise on the ear which is another area of the body that is not commonly injured accidentally. Given the severity of this current unexplained injury, there are concerns that this adolescent is at risk for future more serious, perhaps even life threatening injury without appropriate safety planning and investigation.

Sarah A. Camire, RN, MS, NP-C Medical Evaluation, PageID #1549 (ECF No. 65-4).

There is also a dispute about what Spurwink did after discovering Sean's injuries, whether Spurwink timely reported the injuries to the Maine Department of Health and Human Services ("**DHHS**") under the State's mandatory reporting laws, whether Spurwink conducted an adequate in-house investigation, and whether Spurwink's investigation was curtailed by a directive from DHHS to stand down.[3] On summary judgment, "the inquiry . . . is . . . whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

[3]   The Plaintiffs question the veracity of statements Spurwink's Residential Milieu Supervisor made in her declaration in support of Spurwink's motion for summary judgment, claiming it is at odds with her deposition testimony as a Rule 30(b)(6) witness for Spurwink. In the declaration, the Spurwink supervisor avers that the Maine Department of Health and Human Services ("**DHHS**") directed Spurwink "not to perform a simultaneous, formal internal investigation into the allegations of abuse or neglect while DHHS was investigating the same allegations." Decl. of Victoria St. Louis ¶ 8 (ECF No. 65-24). But at her deposition, Ms. St. Louis was asked if Spurwink engaged in an investigative process of its own or just participated in the DHHS investigation, and she never mentioned any standdown directive from DHHS. St. Louis Dep. 43:10–44:10 (ECF No. 65-20).
   The Plaintiffs also put into evidence two declarations to rebut the claim that DHHS advised Spurwink to stand down. Declarations made by the Program Director for Maine DHHS Adult Protective Services and the DHHS investigator assigned to Sean's case say that neither the investigator nor anyone else at DHHS ever instructed Spurwink not to perform its own simultaneous investigation into Sean's injuries and that DHHS never instructs agencies not to perform their own independent internal investigations into suspected neglect or abuse. Decl. of Sarah Bennett ¶¶ 5–8 (ECF No. 74-1); Decl. of Bolaji Odunlami ¶¶ 4–5 (ECF No. 74-2). As part of their negligence claims, the Plaintiffs allege that Spurwink breached its duty to investigate Sean's injuries. *See* Compl. ¶¶ 35–36, 43, 46 (ECF No. 1). Whether DHHS instructed Spurwink to stand down will likely impact those claims. Because of the competing declarations, this material fact is in dispute, which renders summary judgment inappropriate. *See E.E.O.C. v. Green*, 76 F.3d 19, 24 (1st Cir. 1996).

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. Here there are enough contested facts to require submission to a jury.

## II. Negligence – Sufficiency of the Plaintiffs' Designated Experts

Spurwink also argues that summary judgment is warranted because the Plaintiffs lack necessary experts. Spurwink maintains that the circumstances surrounding Sean's care and his injuries require the Plaintiffs to establish the elements of negligence through expert testimony.[4] For several reasons, Spurwink has not convinced me that the Plaintiffs lack the necessary evidence to survive a motion for summary judgment on this basis.

For example, the cases that Spurwink cites of instances where Maine law requires an expert are distinguishable. Spurwink's cited cases involve medical malpractice claims and claims of negligence by occupational-therapy instructors, athletic trainers, general contractors, firefighters, and attorneys. *See* Def.'s Mot. for Summ. J. ("**Def.'s Mot.**") 17 (ECF No. 66); *see also Montany v. Univ. of New England*,

---

[4] To prevail on a negligence claim under Maine law, "a plaintiff must establish that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty of care, and that the plaintiff suffered an injury/damages as the result of the breach of the duty of care." *Cousins v. Higgins*, No. 1:14-cv-00515-DBH, 2018 WL 3186927, at *7 (D. Me. June 28, 2018), *R. & R. adopted,* 2018 WL 3715703 (D. Me. Aug. 3, 2018), *aff'd,* No. 18-1832, 2019 WL 11234276 (1st Cir. Aug. 13, 2019). "Whether a plaintiff is owed a duty of care is a matter of law. Whether a breach occurred and whether the breach caused the harm in question are questions of fact." *Id.* (internal citations and quotation marks omitted).

5

858 F.3d 34, 37–38 (1st Cir. 2017) (collecting same cases).[5] "[E]xpert testimony may be necessary" in a Maine negligence case to determine "the nature of the appropriate standard of care or practice," if "the matter in issue is within the knowledge of experts only." *Id.* at 37. But "expert testimony may not be necessary 'where the negligence and harmful results are sufficiently obvious as to lie within common knowledge.'" *Searles v. Trs. of St. Joseph's Coll.*, 1997 ME 128, ¶ 10, 695 A.2d 1206 (quoting *Cyr v. Giesen,* 150 Me. 248, 252 (1954)) (holding that injured student athlete did not have to provide expert testimony on "the standard of reasonable care for the health and safety of student athletes applicable to a basketball coach" because that "can be ascertained by a lay jury").

## A.   Standard of Care

As the Plaintiffs point out, the question of the standard of care is a legal one not entrusted to the jury. Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. 15 (ECF No. 75) ("The existence of a duty of care is a question of law for the Court to determine.") (citing *Reid v. Town of Mt. Vernon*, 2007 ME 125, ¶ 14, 932 A.2d 539, 544); *see also Cousins v. Higgins*, No. 1:14-cv-00515-DBH, 2018 WL 3186927, at *7 (D. Me. June

---

[5] In addition to the Maine cases, Spurwink cites an unpublished opinion by an intermediate appellate court in New Jersey, *C.C.V. by C.L.V. v. New Horizons in Autism, Inc.*, No. A-2023-21, 2023 WL 5344870 (N.J. Super. Ct. App. Div. Aug. 21, 2023). That case involved negligence-based claims against a group home for individuals with autism, and the court held that the plaintiffs' claims required expert testimony. In *New Horizons*, one resident sexually assaulted another resident, and determining whether the facility was negligent necessitated understanding "the complexity of autism itself" and the "highly technical, health-related treatment and service program documents approved by the State" for each resident. *Id.* at *8. Applying New Jersey law, the court held that "laypersons could not be expected to have sufficient knowledge or experience" about such a "highly regulated and medically technical" area. *Id.* (internal quotations and citations omitted). While the *New Horizons* case is arguably the closest scenario to the case at hand, it is distinguishable in a few important ways. For example, Sean's case does not involve the interplay between two individuals with autism, nor does it turn on an understanding of any treatment and service program Sean had at Spurwink.

6

28, 2018) (internal quotations and citation omitted) ("Whether a plaintiff is owed a duty of care is a matter of law."). And in this case, the "standard of care" is set, at least in part, by state regulations. In addition to the lay and expert evidence in the record, the Plaintiffs have pointed to the statutes, DHHS regulations, and Spurwink policies governing the mandatory reporting and investigation of suspected child abuse and neglect. See Pls.' Resps. to Reqs. to Strike ¶¶ 120–125 (ECF No. 84). I see no reason why the Plaintiffs cannot use the state's regulations, Spurwink's policies, and statements made by Spurwink's own professionals to show the standard of care and how it may have been breached. The Defendant will be free to explain, through its experts, how a residential treatment facility should act when dealing with a client with Sean's conditions, but the basic standard is not so technical that a plaintiff's expert is necessary to proceed.

Further, this is not a case where the Plaintiffs have failed to designate *any* expert; they have two. Kieran Kammerer, MD, is Sean's pediatrician who observed and treated some of the injuries Sean sustained at Spurwink. Pls.' Third Am. Rule 26(a)(2)(C) Designations 1 (ECF No. 74-15). Dr. Kammerer testified that Sean presented with "nonaccidental trauma," which could include self-injurious behavior, but that self-injury "wouldn't have explained what was seen in [Dr. Kammerer's] office." Kammerer Dep. 207:2–207:21 (ECF No. 65-10). Dr. Kammerer also could not rule out that "intentional physical abuse could be an explanation for the injuries [he] saw in 2016." Kammerer Dep. 204:21–204:24.

The Plaintiffs' second designated expert is John Philippe Kelty, Ph.D., a clinical psychologist who has worked at or consulted for residential treatment facilities. Pls.' Third Am. Rule 26(a)(2)(C) Designations 3. Dr. Kelty testified that there were a number of things Spurwink did around Sean's incidents in the summer of 2016 that "raise concerns" to him, like Spurwink being "a little late" in having Sean evaluated by Spurwink's child abuse clinic and that it was "not clear" that Spurwink "increased supervision" of Sean. Kelty Dep. 64:11–64:24, 85:7–85:10, 83:7–83:19 (ECF No. 65-13). Dr. Kelty was mainly concerned that Spurwink did not file a mandatory report with DHHS in June "when they should have" and Spurwink "did not do an internal investigation . . . formally and in a timely manner," as required by DHHS policies and Spurwink's own policies, which "would have been a lot faster than DHHS and . . . might have been able to have more success in determining what was going on." Kelty Dep. 72:13–72:20, 87:18–87:23.

### B.   Remaining Elements of Negligence

As to the other elements of a negligence claim—breach, causation, and damages—the facts underpinning these elements are disputed. Specifically, the parties dispute whether Spurwink breached the duty of care that it owed to Sean and what caused Sean's injuries. In its motion for summary judgment, Spurwink highlights the anticipated testimony of its own three experts, who are expected to opine that Sean's injuries were the result of self-injurious behavior or accidents and that Spurwink's policies and actions concerning Sean's injuries "were appropriate and consistent with industry standards." Def.'s Mot. 13–15. All this does is show that Spurwink's expert testimony conflicts with the Plaintiffs' expert testimony. "Ruling

8

on a motion for summary judgment, [I am] required to assume that any disputes of material fact—*including conflicting opinions offered by competent experts*[6]—could be resolved by the jury in the [non-movants'] favor." *Jones v. City of Boston*, 845 F.3d 28, 32 (1st Cir. 2016) (emphasis added); *see also Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995) ("In most situations, causation questions are both factbound and case-specific. Thus, such questions ordinarily are grist for the factfinder's mill."). Given this standard, a jury could believe Dr. Kammerer's opinion that Sean had nonaccidental trauma and that Sean's injuries were not consistent with Sean hitting himself. The jury could infer from Dr. Kammerer's opinion that Spurwink was negligent in its care of Sean during 2016 and 2017. Summary judgment is therefore not appropriate because, "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne*, 53 F.3d at 460.[7]

Even if the jury believes, as it could, that Sean's injuries were self-inflicted, that still would not end the matter. It is undisputed that Sean suffered injuries, including serious bruising and broken bones, and that these injuries were discovered while he was living at Spurwink and under Spurwink employees' care. The summary

---

[6] Spurwink is not arguing that the Plaintiffs' experts are not competent to give testimony on their respective designated topics and should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

[7] As for the Plaintiffs' other expert, Spurwink argues that, "[a]part from . . . two criticisms, according to Dr. Kelty, Spurwink's response to Sean's injuries were all within the standard of care and represented best practices . . . ." Def.'s Mot. for Summary J. 16 (ECF No. 66). But the underlying deposition testimony Spurwink cites does not support that assertion. *See* Kelty Dep. 82:12–87:12 (ECF No. 65-13).

judgment record shows that even though Spurwink was made aware of these injuries, Sean kept getting hurt. A reasonable juror could conclude that, even if a Spurwink employee did not physically abuse Sean, the actions or inactions of Spurwink contributed to Sean continuing to be injured while at Spurwink. In other words, the Plaintiffs have put forward trial-worthy evidence as to whether Spurwink failed to protect Sean from whatever was causing his injuries, regardless of whether it was physical abuse by a Spurwink staff member or resident, or neglect in the form of Spurwink staff allowing Sean to engage in serious self-injurious behavior. While the exact medical cause of Sean's injuries might lay in the province of an expert, jurors can "apply their common knowledge" to decide whether Spurwink's failures concerning Sean's repeated injuries "constitute[ ] a breach by [Spurwink] of [its] duty to exercise reasonable care for the health and safety of [Sean]." *Searles*, 1997 ME 128, ¶ 11, 695 A.2d 1206; *see also Schultz v. Gould Acad.*, 332 A.2d 368, 370 (Me. 1975) ("Plaintiff, as a student attending the defendant Academy, had the legal status of a business invitee, to whom defendant's employee owned a duty to exercise reasonable care in taking such measures as were reasonably necessary for her safety in light of all then existing circumstances.").[8]

---

[8] As mentioned above, the Plaintiffs also have put forward evidence from which a jury might infer that Spurwink did not follow the mandatory reporter statute or DHHS regulations. While "violation of a safety statute or regulation" is "not negligence per se," it can be "evidence of negligence." *Castine Energy Const., Inc. v. T.T. Dunphy, Inc.*, 2004 ME 129, ¶ 10, 861 A.2d 671. Therefore, that fact too should go to the jury. *See Elliott v. S.D. Warren Co.*, 134 F.3d 1, 5 (1st Cir. 1998) ("[B]y instructing the jury that it might consider a discerned [statutory] violation as evidence of [the defendant]'s negligence—no more, no less—the district court gave the jurors proper guidance under the governing law."); *McCullough v. Lalumiere*, 156 Me. 479, 483 (1960) ("The breach of law is a fact to be considered with other facts by the factfinder. It is evidence of negligence, but not proof of negligence.").

## III.    Section 504 of the Rehabilitation Act

Having decided that the Plaintiffs' negligence-based claims survive summary judgment, I turn briefly to the Plaintiffs' claim that Spurwink discriminated against Sean because of his disability in violation of § 504. According to Spurwink, if the Plaintiffs cannot establish a prima facie negligence case against Spurwink by showing that Spurwink's "care for Sean Lewis was beneath the standard of care and caused him harm," then the Plaintiffs "similarly cannot prove that Sean was somehow treated differently than any other 'qualified individual' receiving services and such difference in treatment was motivated solely by an intent to discriminate against Sean because of his disability." Def.'s Mot. 23. Because I conclude that the Plaintiffs have shown that there are disputed material facts that preclude summary judgment on the negligence claims, I reject Spurwink's argument that the § 504 claim "likewise" must fail. Def.'s Reply Mot. in Supp. of Mot. for Summ. J. 5 (ECF No. 80).

As I covered in my order on Spurwink's motion to dismiss, to prevail on a § 504 claim, the Plaintiffs must prove four elements: " '(1) that [Sean] is disabled; (2) that [ ]he sought services from a federally funded entity; (3) that [ ]he was 'otherwise qualified' to receive those services; and (4) that [ ]he was denied those services 'solely by reason of [his] disability.' " Order on Def.'s Mot. to Dismiss (ECF No. 9) 7 (*quoting Lesley v. Hee Man Chie*, 250 F.3d 47, 53 (1st Cir. 2001) (quoting 29 U.S.C. § 794(a))).

Spurwink agrees that the first three elements are met. Def.'s Mot. 22 ("Sean Lewis is disabled, sought services from a federally funded entity, and was 'otherwise qualified' to receive those services."). To survive summary judgment on their § 504 claim, the Plaintiffs' evidence must "present[ ] a triable issue" as to the fourth

11

element—whether Spurwink denied Sean benefits under its program or subjected him to discrimination "solely by reason of [his] disability." *Lesley*, 250 F.3d at 53. The two-part question is whether "there is a causal connection between [Sean's] disability and the discriminatory action" and whether "his disability was the only cause of the discriminatory action." *McCann ex rel. J.M. v. York Sch. Dep't*, 365 F. Supp. 3d 132, 145 (D. Me. 2019) (internal citation omitted).

This is a close call, but "it is sufficient that the disability caused the individual to do or not do something, which, in turn, caused the discriminatory action." *Shaikh v. Tex. A & M Univ. Coll. of Med.*, 739 F. App'x 215, 222 (5th Cir. 2018). On the record before me, material issues of fact remain as to whether Sean's disability caused him to do or not do something that caused discriminatory action by Spurwink. For example, the Plaintiffs have submitted evidence that a particular Spurwink staff member had worked the overnight shift the day before many of Sean's injuries were discovered. If a jury concluded that a Spurwink employee physically abused Sean, it could infer that Sean was targeted solely because of his disability, in other words because Sean was nonverbal and unable to disclose the abuse. A jury could similarly infer that, because Sean could not readily complain of his injuries because of his disabilities, Spurwink delayed conducting an internal investigation. Accordingly, summary judgment is not appropriate on the Plaintiffs' § 504 claim.

Because none of the claims in this case are suitable for resolution as a matter of law, Spurwink's motion for summary judgment (ECF No. 66) is **DENIED**.

SO ORDERED.

                                                /s/ Nancy Torresen_____
                                                United States District Judge

Dated this 27th day of February, 2025.